***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission adopts the Opinion and Award of Deputy Commissioner Glenn with minor modifications.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All the parties are bound by and subject to the North Carolina Workers' Compensation Act. All *Page 2 
parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. On November 28, 2004, plaintiff was performing her duties as a machine operator when she became caught by parts of the machine, causing injuries including but not limited to, her right shoulder, right thumb, torn right deltoid, nine broken ribs, and a punctured lung.
3. Defendant was an approved self-insured with Frank Gates Services Company serving as its Servicing Agent at all relevant times herein.
4. The parties have entered into and the North Carolina Industrial Commission has approved a Form 21 Agreement for compensation for disability, with defendants admitting on said form that plaintiff's average weekly wages were $1,063.45 per week, yielding the maximum workers' compensation rate at the time of her injury in the amount of $688.00 per week.
5. The parties agreed that the depositions and medical records of Dr. J. Paul Martin and Dr. Dennis White be made a part of the evidentiary record.
6. Upon agreement of the parties, plaintiff underwent an IME evaluation by Dr. Michael Dockery of OrthoCarolina on March 16, 2007, whose report is made a part of the evidentiary record.
7. The parties agree that all Industrial Commission forms, orders and decisions are entered into evidence by stipulation, including but not limited to the following:
 a. Form 21, dated 12-21-04.
 b. Form 28, dated 9-6-05.
 c. Form 33, dated 9-18-06.
 d. Form 33R, dated 9-25-06.
 e. Motion to Assign Rehabilitation Nurse filed 9-18-06. *Page 3 
 f. Order by Chief Deputy Commissioner Stephen Gheen, filed 10-6-06.
 g. Order excusing case from mediation, filed 11-1-06.
 h. Amended Form 33, dated 11-30-06. (6a-h received as Stipulated Exhibit 2)
 i. Plaintiff's paycheck stubs after 11-28-04.(Received as Stipulated Exhibit 6)
 j. Arvin Meritor employee handbook. (Received as Stipulated Exhibit 3)
 k. Letter from plaintiff's counsel to defense counsel dated 9-29-06. (Received as Stipulated Exhibit 4)
 l. Rehabilitation records of Carolina Case Management. (Received as Stipulated Exhibit 5)
 m. Grinder Operator Job Video. (Received as Stipulated Exhibit 7)
 n. Plaintiff's counsel's letter dated 10-6-06. (Received as Stipulated Exhibit 8)
8. The parties agree that the medical and therapy records generated by the following clinicians identified below be made a part of the evidence in this matter. (Medical records received as Stipulated Exhibit 2)
 a. Robert Armstrong, M.D.
 b. Daniel W. Hankley, M.D.
 c. Richard S. Broadhurst, M.D.
 d. Terence E. Fitzgerald, Ph.D.
 e. Bruce A. Gilpin, M.D.
 f. J. Paul Martin, M.D. *Page 4 
 g. Mission St. Joseph's Hospital
 h. Dennis P. White, D.O. (6a — 6h received as Stipulated Exhibit 2)
 I. Charlie Robbins, PT.
 j. Gordon Groh, M.D.
 k. Michael Dockery, M.D.
9. At the outset of the hearing of this matter before the deputy commissioner, counsel for defendants stipulated that defendants were accepting plaintiff's cervical neck problems as causally related to her admittedly compensable injury of November 28, 2004.
10. The issues to be determined from the hearing are as follows:
 a.) Whether plaintiff sustained a compensable injury by accident to her neck as a result of her accident of November 28, 2004, and if so, what are the compensable consequences thereof? In that defendants have stipulated that plaintiff's neck was injured as a direct result of plaintiff's compensable injury by accident, this is no longer an issue to be determined.
 b.) Payment of necessary medical treatment, including but not limited to payment of prescription and travel expenses.
 c.) Whether defendants are illegally using absences from plaintiff's workers' compensation claim against her attendance/disciplinary proceedings? (Note: Defendants object to this issue as beyond the Industrial Commission's jurisdiction, and object to its inclusion as an issue).
 d.) Whether plaintiff is entitled to attorney fees pursuant to N.C. Gen. Stat. § 97-88.1? *Page 5 
 ***********
The Pre-Trial Agreement along with its attachments and any stipulations that have been submitted by the parties are hereby incorporated by reference as though they were fully set out herein.
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was a 43 year old mother of four children and had been employed by defendant for approximately 13 years.
2. On November 28, 2004, plaintiff sustained an admittedly compensable injury by accident while she was performing her duties as a machine operator on the wring and cover machine when she was caught and crushed by parts in the machine causing injuries to her right shoulder, right thumb, right elbow, a torn right deltoid muscle, nine fractured ribs, a punctured lung, and post-traumatic stress disorder (PTSD) as a result thereof.
3. Plaintiff was found shortly after the accident to be unresponsive to sound and stimuli, had stopped breathing, was required to be intubated, and was transported via helicopter to Mission St. Joseph's Hospital. Upon arrival at the hospital plaintiff was reported to exhibit decortical posturing. Dr. Martin explained that this is the second level of the brain shutting down due to lack of oxygen, noting that when the brain starts shutting down towards the brain stem the posture assumed is decortical, meaning the arms are extended with the palms rotated to the outside. *Page 6 
4. Plaintiff was diagnosed with injuries to her right shoulder, right thumb, right elbow, torn right deltoid muscle, nine fractured ribs, and a punctured lung and required 13 days inpatient treatment at Mission-St. Joseph's Hospital.
5. On January 17, 2005, plaintiff was seen by Dr. Gordon Groh of Blue Ridge Bone Joint, who diagnosed her with myofascial pain syndrome of the right shoulder, post-crush injury, and a partial tear of the deltoid muscle. On February 18, 2005 plaintiff saw Dr. J. Paul Martin, defendant's designated occupational physician, who diagnosed her with status post-near death trauma, right shoulder crush injury, right rib fractures, and PTSD. At the conclusion of his evaluation, Dr. Martin reported in his notes that he had called Doris Williams with defendant and recommended that plaintiff be evaluated by Dr. Fitzgerald and treated for PTSD and that planning should begin for transitional duty for plaintiff.
6. Subsequently, plaintiff came under the authorized care of Dr. Terrence Fitzgerald and was treated for PTSD associated with her near death crush injury.
7. On February 22, 2005, plaintiff was evaluated and treated by Dr. Dennis White, a specialist in chronic pain management. Upon his initial examination, Dr. White noted that plaintiff suffered from "neck, right para-scapular, mid-thoracic and right upper extremity pain, neck pain with radiating headaches and right upper extremity weakness." Based upon plaintiff's examination, Dr. White diagnosed plaintiff as suffering from neuropraxia/brachial plexopathy and recommended undertaking peripheral nerve branch blocks into the right para-scapular and para-cervical areas. Dr. White was authorized to undertake right spinal accessory nerve branch blocks, right dorsoscapular nerve branch blocks and right cervical plexis blocks on March 16, 2005. Dr. White's working diagnosis of plaintiff was chronic CT spine and para-scapular pain, right forearm pain, cervicogenic headache and status post-industrial crush injury. *Page 7 
8. On April 6, 2005, plaintiff returned to see Dr. White, and it was noted that plaintiff had responded favorably to the radical nerve branch block. However, upon examination Dr. White continued to note the cervical facet line revealed segmental restrictions and concordant pain provocation with deep palpation.
9. On April 15, 2005, plaintiff returned to Dr. Martin, at which time he noted that plaintiff continues having right neck and shoulder pain with associated right rib pain. Upon examination he noted that plaintiff had mild para-cervical tenderness extending into the right trapezius. Based on his examination, Dr. Martin indicated that these symptoms were the same symptoms for which he had evaluated plaintiff initially.
10. On April 18, 2005, plaintiff returned to see Dr. White for evaluation of the CT spine and para-scapular pain. Dr. White noted pain centralized to the axial spine with symptoms being noted primarily with cervical flexion and extension. Upon examination, Dr. White noted CT junction first rib complex motion barrier, particularly with left cervical rotation and passive joint motion. Based on plaintiff's improvement, Dr. White released plaintiff to return to work with restrictions of lifting and carrying ten pounds with no repetitive bending, twisting, pushing, or pulling. As part of her restrictions, plaintiff was to incorporate sit to stand/walk activities, alternating on a one to one ratio and to limit working for two hours per day for the first week and then four hours per day the following week.
11. During the course of treatment, Dr. White provided copies of all treatment notes to plaintiff's primary treating physician, Dr. Bruce Gilpin, who was continuing to follow up with plaintiff for her primary care and secondary post-injury needs.
12. On May 2, 2005 plaintiff returned to work. In spite of the limitations imposed by Dr. White, plaintiff was not provided light-duty work within her restrictions, but rather was *Page 8 
returned immediately to the shop floor, where she experienced anxiety and stress related to her post-traumatic stress disorder.
13. On May 6, 2005, plaintiff returned to see Dr. White, who modified plaintiff's work duties due to the psychogenic issues plaintiff's environment would cause. Dr. White limited plaintiff to clerical/administrative duties as opposed to the shop floor. Dr. White limited plaintiff to two hours per workday in light of her ongoing physical therapy.
14. On May 13, 2005, Dr. Fitzgerald reported that he received a phone call from John Frazier and Doris Williams of the management for defendant regarding plaintiff's return to work and being placed directly on the production floor, her return to Dr. White the previous Friday, and her increased anxiety as a result of plaintiff's return to work efforts. Subsequent to his conversation with Mr. Frazier and Ms. Williams, Dr. Fitzgerald reported that he contacted plaintiff directly at the workplace to discuss her concerns regarding return to work and any apparent conflict between his and Dr. White's recommendations. Dr. Fitzgerald confirmed plaintiff was very motivated to return to work and was progressing in her physical therapy and recommended she keep her upcoming appointment.
15. On May 18, 2007, plaintiff returned to see Dr. Fitzgerald, at which time he indicated that plaintiff should keep her return to work at two hours per day in the clerical assignment, with an additional three hours of physical therapy, and that plaintiff would be reassessed in approximately one month. Dr. Fitzgerald also reported that Dr. White would like Dr. Gilpin to manage plaintiff's medications.
16. Upon return to Dr. White on June 15, 2005, plaintiff was noted to be improved in her physical and emotional symptoms. Dr. White formulated a return to work plan to include two hours of *Page 9 
clerical work and two hours of shop floor work for four weeks, two hours of clerical work and four hours of shop work for four weeks, two hours of clerical work and six hours of shop work for four weeks, and then eight hours of shop work for four weeks, at which point plaintiff would be re-evaluated. Dr. White also indicated that plaintiff's global limitations were ten pounds for lifting/carrying.
17. Plaintiff continued her return to work efforts with defendant, and she was placed on a variety of jobs, including forklift operator and grinder operator. When performing these job duties, which required repetitive forward reaching and utilizing two-handed gauges weighing approximately three to five pounds, plaintiff experienced a significant exacerbation of her right upper extremity and neck symptoms.
18. Dr. J. Paul Martin, defendant's occupational physician, evaluated plaintiff on August 8, 2005 and also reported that plaintiff had been working in the grinder area and had continued muscle pain in her right bicep up into her right shoulder and neck, right bicep tenderness, right trapezius tenderness, decreased extension of her neck, and minimal chest wall tenderness and recommended that plaintiff not perform the grinder job. Dr. Martin was of the opinion that these symptoms were caused by plaintiff's original injury, for which he had seen her earlier in February and April.
19. On August 9, 2005, plaintiff returned to see Dr. White and reported having progressed to working six hours on the shop floor, with her primary duties involving repetitive use of the right upper extremity and checking and manipulating dial gauges. Dr. White noted the significant use of the upper extremity at shoulder level with significant grasping and internal rotation had exacerbated plaintiff's shoulder pain and reported plaintiff's complaints to be much more global. Upon examination Dr. White noted significant findings of increased pain on active shoulder range of motion and diagnosed plaintiff with an overuse repetitive injury with poor *Page 10 
ergonomics secondary to overhead activity and recommended an orthopaedic consultation, noting further that plaintiff's current findings are multiple in nature with a strong repetitive use component. Dr. White further recommended that if plaintiff was to continue in the grinder capacity she would need to be on a raised platform surface where her shoulder can essentially be maintained at a neutral posture with motion limited to mild flexion. Dr. White limited plaintiff's work to eight hours per day in the clerical position lifting no more than ten pounds with no repetitive use of her upper extremity or work on the shop floor.
20. On August 15, 2005, after plaintiff experienced a pain flare up while attempting the grinder position, Charlie Robbins, a physical therapist at Blue Ridge Physical Therapy, visited defendant's worksite to observe and perform an onsite job analysis of the grinder operator position which plaintiff had been working on a temporary basis. Mr. Robbins reported plaintiff's job duties would require her to monitor two grinding machines, check the OD (outside diameter) of the housing spindle, use four grip dial gauges single handed and two ring gauges two-handed, averaging 120 housings per shift, with every 12-15 housings requiring checking on seven potential sites with gauges. He reported the lifting requirements to lift four dial gauges weighing three to three and a half pounds each and master ring gauges weighing five to five and a half pounds each. The frequency of such lifting was reported to be 265 times per shift at a height of 48 inches with the right upper extremity reaching approximately 23 inches to apply the gauges to the housing.
21. On August 16, 2005, plaintiff returned to see Dr. Fitzgerald, who noted that plaintiff was emotionally upset and reporting that she had had an increase in her right shoulder tenderness and spasms due to the repetitive demands of the grinder operator position. Plaintiff *Page 11 
reported that after communicating Dr. White's orders to defendant's management as was required plaintiff saw a negative change the management's attitude.
22. On August 29, 2005, plaintiff was re-evaluated by Dr. Martin with renewed complaints of right shoulder pain through her neck. Upon examination, Dr. Martin noted that plaintiff had positive impingement signs and positive pain with abduction against resistance. Dr. Martin continued plaintiff's physical therapy and concurred with Dr. White's recommendations and recommended plaintiff return to her orthopedist.
23. On August 29, 2005, plaintiff returned to see Dr. Groh who noted that plaintiff was globally tender over her shoulder superior and inferior scapular borders with paraspinal tenderness. Based on this, Dr. Groh diagnosed plaintiff with myofascial pain disorder and recommended that plaintiff return to Dr. White for further follow up and suggested a functional capacity evaluation be obtained.
24. On September 2, 2005, plaintiff returned to Dr. Martin at which time Dr. Martin specifically noted on the return to work/interim duty limitation report that plaintiff's symptoms were related to her injury, placed her on limited duty of no lifting more than 15 pounds, and no reaching or lifting above shoulder level, and specifically recommended secretarial duties beginning September 2, 2005 through September 9, 2005.
25. On September 6, 2005, plaintiff underwent an MRI scan at the recommendation of Dr. Martin which showed mild sub-acromial/sub-deltoid bursitis. On September 9, 2005, plaintiff returned to Dr. Martin, who again noted that in his opinion plaintiff's symptoms were related to her initial injury, continued her limited duty, and specifically indicated that plaintiff should be limited to office work from September 9, 2005 through September 23, 2005. On September 21, 2005, Dr. Martin renewed plaintiff's clerical duty restriction through October 15, 2005. *Page 12 
Upon repeat examination on October 5, 2005, Dr. Martin again renewed plaintiff's office work limitation through November 5, 2005. Dr. Martin then recommended that plaintiff begin the work hardening program.
26. On December 27, 2006, upon completion of work hardening, plaintiff underwent a functional capacity evaluation (FCE), which was completed by Mike Piercy, of Blue Ridge Bone Joint. Mr. Piercy noted that plaintiff's employment was a grinder operator/housing technician and specifically compared plaintiff's functional capacity with the job analysis performed on August 15, 2005 by physical therapist, Charlie Robbins, in which Mr. Robbins described the basic job duties of the grinder operator/housing technician. Based on this job analysis, Mr. Piercy reported the grinder operator position required monitoring two grinding machines, checking the OD (outside diameter) of the housing spindles, using four grip dial gauges (single hand), and two rain gauges (2 hands), an average of 120 housings per shift with every 12-15 housing requiring a check of seven potential sites on the housing with the different gauges. Mr. Piercy further indicated the general handling duties (lifting gauges) required by the job were in the medium duty category, as well as the above shoulder work and reaching forward (constant).
27. Based on plaintiff's determined functional demonstrated abilities, Mr. Piercy reported that plaintiff was limited at the light physical demand level lifting ten pounds on a frequent basis, which did not match the lifting requirement of the grinder operator position. Mr. Piercy further indicated multiple limitations which prevented plaintiff from doing the grinder job including that plaintiff was capable of only infrequent above shoulder lifting and infrequent to occasional forward reaching. Mr. Piercy did note that any restrictions were on plaintiff's dominant right hand and that there were no restrictions on plaintiff's left upper extremity. *Page 13 
28. Based upon the job duties as observed and determined by Mr. Robbins and the FCE performed by Mr. Piercy, plaintiff was incapable of performing the job duties of the grinder operator position.
29. On December 28, 2005, subsequent to the FCE on December 27, 2005, plaintiff returned to Dr. Martin with continued complaints of right shoulder and right neck pain. Dr. Martin reported that he specifically reviewed the FCE and reported that plaintiff was capable of light physical demand level for eight hours per day. He also reviewed the grinder operator/housing technician position and reported that it is not a match for plaintiff's level of ability. Dr. Martin further stated that plaintiff's inability to perform these duties was further confirmed when plaintiff attempted to do the job and developed significant symptoms. Based on his review of plaintiff's functional abilities and the job duties, Dr. Martin reported that he strongly advised defendants to review plaintiff's skills and to find a job that approximates her physical capacity. On December 20, 2005, Dr. Martin completed a "return to work/interim duty limitations report" reporting that plaintiff was discharged from Dr. Martin's care with permanent duty restrictions of light labor based upon the December 27, 2005 FCE.
30. Dr. Martin was of the opinion that all of plaintiff's neck complaints were caused by the November 29, 2004 accident and further stated that based on his evaluations, review of plaintiff's demonstrated functional capacities, and the job duties of the grinder operator position that while plaintiff may be able to perform the grinder operator position left-handed, he would need to observe her doing so before rendering any type of opinion. He further opined that if plaintiff attempted to do a two-handed job with one hand that it would place her at a significant risk for a number of problems. Based upon this, Dr. Martin opined that based on his evaluations, the FCE, and the job description that he would recommend that plaintiff not be placed in the *Page 14 
grinder position. Dr. Martin indicated that plaintiff would be better suited for work in a different position than grinder position. Defendants argued that plaintiff could perform this position but had not allowed Dr. Martin to view plaintiff performing grinder position job. At the time of the hearing before the deputy commissioner, defendants had not asked Dr. Martin when he could visit the work site to determine whether plaintiff could attempt the grinder position with only the use of her left hand.
31. On January 5, 2006, plaintiff was evaluated by Dr. Daniel Hankley of Blue Ridge Bone Joint for review of plaintiff's FCE. Plaintiff was noted to complain of pain in her right shoulder over the anterior aspect of the scapula and over the paraspinal muscles on the right side. Such complaints were confirmed upon examination by Dr. Hankley, who, after reviewing the FCE, confirmed plaintiff's limitations to light physical demand level for eight hours per day. Dr. Hankley reported that plaintiff retained a fifteen percent permanent partial impairment rating to her right upper extremity and indicated that plaintiff may be entitled to additional impairments for her fractured ribs and punctured lungs, secondary to the crush injury but felt he was unqualified to render such an opinion.
32. At the time of her impairment rating in January 2006, plaintiff had been discharged by Dr. White, had been rated and released by Dr. Hankley from further treatment, and had been recommended by Dr. Martin to return to her family physician, Dr. Bruce Gilpin, for medication management, who then became her primary authorized physician for the injuries.
33. On May 2, 2006, plaintiff was seen by Dr. Gilpin when she reported a flare up of her shoulder and neck pain over the past four days. Based on his examination, Dr. Gilpin indicated that plaintiff was under his care from May 3, 2006 and May 4, 2006 and that plaintiff *Page 15 
could return to work on May 5, 2006. He further referred plaintiff to Dr. White for re-examination.
34. On May 23, 2006, plaintiff returned to Dr. White approximately at which time Dr. White reported that plaintiff suffered from chronic right neck and shoulder pain in addition to an occipital headache. Dr. White noted plaintiff had attempted to work in the forklift operator job, but due to PTSD, anxiety and somatic complaints, as well as physical problems with rotating her neck and looking different ways, plaintiff was unable to continue to do so. Dr. White further noted that plaintiff had been working in a clerical duty performing predominantly keyboard work reporting that she developed pain in her shoulder upon performing keyboard activity, neck and right suprascapular pain persistent on the right, as well as neck complaints which radiated into the neck and at the base of the skull. Upon examination Dr. White reported limited range of shoulder abduction to thirty degrees with further pain precipitating in the scapular and neck region and diagnosed "chronic cervical and suprascapular pain in addition to probable cervicogenic headaches excluding the migraine componant". Dr. White testified that all of his treatment for plaintiff, including the treatment of May 23, 2006 for her neck, in his opinion was related to the November 29, 2004 injury.
35. Dr. White recommended additional medial branch blocks at C4-7 and C2-3 and C3-4 facet blocks, which he also stated were similar blocks to previous authorized blocks.
36. Defendants assigned a case manager, Cindy Cook, and provided rehabilitation reports to Doris Williams of defendant's company and to the adjuster for Frank Gates Company reporting Dr. White's findings and recommendations. Ms. Cook also testified that she specifically informed Ms. Williams, as she was required to do, that in Dr. White's opinion *Page 16 
plaintiff's cervical problems were a continuation of her prior cervical problems and were causally related to her original injury.
37. Subsequent to plaintiff's increased problems in May, returning for treatment to Dr. Gilpin and Dr. White and Dr. White's recommendation for additional nerve blocks, defendants denied further authorization for treatment of plaintiff's cervical symptoms with Dr. White and took the position that plaintiff's cervical condition was not related to her original injury, in spite of having previously authorized treatment by Dr. White and Dr. Martin on multiple occasions for plaintiff's neck symptoms and in spite of being made aware of Dr. White's opinion that such symptoms continued to be related to her admitted injuries.
38. In June of 2006 and September of 2006, Dr. White undertook a series of diagnostic blocks. Specifically, during the September 1, 2006 visit, Dr. White stated in his opinion that plaintiff's medical procedures which he was undertaking pertained to her injury sustained on November 29, 2004. As a result of the blocks, Dr. White reported that plaintiff was unable to work on September 1, 2006 and September 2, 2006 and reported that his current medical treatment was related to injuries sustained at work on November 29, 2004.
39. In September of 2006, defendants retained counsel at which time defendants requested to take the deposition of Dr. White and Dr. Martin to determine if plaintiff's cervical complaints and treatment were related to plaintiff's November 29, 2004 admitted injury. Defendants' position was contrary to the opinion of Dr. White that plaintiff's current cervical problems continued to be related to her original injury.
40. By letter of September 29, 2006, plaintiff's counsel provided a copy of Dr. White's September 1, 2006 branch block note in which Dr. White specifically stated the procedure was related to the original injury, which had been his impression all along. This letter *Page 17 
also pointed out that defendants had previously authorized treatment for plaintiff's neck symptoms on multiple occasions by way of Dr. White and Dr. Martin and that such neck complaints had been confirmed by defendants' own rehabilitation nurse, Cindy Cook. Plaintiff's counsel's letter also pointed out that the grinder operator job had been determined to be inappropriate by the FCE completed by Mike Piercy, and inquired as to why defendants were refusing to abide by light-duty clerical work based on the recommendations of Dr. White and Dr. Martin.
41. By letter of October 6, 2006, defense counsel stated that based on discussion of the claim with defendants, in spite of the previously provided statements by Dr. White and in spite of being provided with a medical questionnaire completed by Dr. White indicating the treatment was causally related to plaintiff's original injury, defendants continued to deny the causal relationship of plaintiff's recent onset of neck complaints. However, in spite of such continued denial defendants offered, and did in fact provide ongoing treatment for plaintiff's neck complaints thereafter without prejudice. Defense counsel's letter also indicated in the event plaintiff required additional treatment plaintiff should personally notify Ms. Williams as opposed to communicating directly with her rehabilitation nurse or the claims adjuster at Frank Gates Company, defendant's servicing agent.
42. On November 15, 2006, Dr. White again saw plaintiff at which time Dr. White noted that he had been provided a videotape of plaintiff performing the grinder operator position at defendant's work site and specifically inquired about using plaintiff's left hand to perform the activities, and was informed by plaintiff that due to lack of dexterity and skills she was unable to effectively perform the required operations. Dr. White further stated upon review of the previous FCE it is likely that plaintiff would have difficulty performing the grinder position. Dr. White *Page 18 
reviewed the onsite job assessment performed by Charlie Robbins on August 15, 2005 and noted the videotape produced and provided to him did not reveal any two-handed work activities as indicated by Mr. Robbins. He was of the opinion based on the repetitive activities required, specifically the repetitive reaching, that the grinder job would be problematic for plaintiff and would recommend against this. He further indicated that the job requirements of the grinder position were inconsistent with FCE results.
43. Pursuant to an Order by Deputy Commissioner Philip Holmes, the parties deposed Dr. White and Dr. Martin on February 26, 2007. Dr. Martin confirmed his opinion that plaintiff's neck problems were directly due to plaintiff's severe crush injury, and further stated in his opinion that plaintiff was incapable of performing the grinder operator position as outlined in the job assessment on August 15, 2005 by Mr. Robbins and the FCE completed by Mr. Piercy on July 27, 2005. Likewise, Dr. Martin confirmed in his opinion that plaintiff's cervical problems beginning in May of 2006 were a direct and proximal result of her severe crush injury on November 29, 2004. Dr. Martin further stated that while plaintiff may have the possibility of performing the grinder operator position left handed, this would require further inquiry and also input from Dr. Fitzgerald. However, he also opined that performing the grinder position left-handed would place plaintiff at an increased risk of a variety of other problems.
44. In spite of having the opportunity to do so, defendants did not take the deposition of Mr. Robbins or Mr. Piercy to determine if plaintiff was capable of performing the grinder operator position left handed, nor did they undertake any onsite assessment to determine the same.
45. At the hearing of this matter, defendants offered the testimony of Mr. Don McCreary, plaintiff's supervisor in the grinder operator position. Mr. McCreary advised that no *Page 19 
individual would perform such job duties unsupervised for a minimum of two weeks. However, this is contrary to plaintiff's testimony that she received only several days of training and then was released to perform the grinder operator position unsupervised, at which time she experienced a severe increase in her shoulder and neck pain.
46. Mr. McCreary testified that the repetitions reported in the job analysis performed by Mr. Robbins on August 15, 2005 were in error and highly elevated. However, at no time following Mr. Robbins' job analysis, nor after the July 27, 2005 FCE by Mr. Piercy, which was based significantly on the grinder operator job analysis, did defendants attempt to clarify this information. Even through the date of the depositions of Dr. Martin and Dr. White, defendants did not attempt to clarify any alleged error in the repetitive nature of the grinder job.
47. Mr. McCreary also testified that other individuals have performed the grinder operator position on a one handed basis. However, defendants did not offer, nor did Mr. McCreary testify, that any such individuals would perform such one handed work on a permanent basis. Specifically, Mr. McCreary testified that individuals performing the work on a one handed basis were doing so on a temporary basis while recovering from an injury or other restrictions. There was no testimony offered by defendants that the modified one handed grinder operator position was available in an open competitive environment with defendant on a permanent basis, and defendants have failed to prove such job was suitable.
48. Plaintiff's stipulated payroll records clearly establish that after her release to full time duties on or about August 1, 2005 plaintiff was not permitted to work overtime and her earnings were significantly diminished subsequent to her doctors' recommendations against the grinder job and for clerical work by both Dr. White and Dr. Martin beginning in August of 2005 and continuing thereafter. *Page 20 
49. Based on the stipulated medical records, plaintiff required absences for treatment with Dr. Gilpin for her neck and cervical complaints on February 8 and 14, 2006, April 12, 2006, May 2, 2006, July 7, 2006, August 17, 2006, October 17, 2006, December 15, 2006 and May 1, 2007. Plaintiff also required medical treatment with Dr. White for her neck and cervical problems for which she was not paid TTD benefits on August 9, 2005, May 23, 2006, June 8 and 28, 2006, September 1, 2006, October 10, 2006 and November 15, 2006.
50. Based on the stipulated payroll records, plaintiff's post return to work wages are as follows:
 2005
 8/7 $613.12 10/23 766.40
 8/14 500.08 10/30 766.40
 8/21 546.06 11/6 766.40
 8/28 584.38 11/13 153.28
 9/04 626.53 11/20 689.76
 9/11 431.10 11/27 613.12
 9/18 735.74 12/04 766.40
 9/25 459.84 12/11 766.40
 10/9 689.76 12/18 459.84
 10/16 306.56 12/25 766.40
 10/18 728.08

 2006
 1/1 $766.40 6/18 803.41
 1/8 766.40 6/25 803.40
 1/15 688.80 7/2 642.73
 1/22 410.35 7/9 748.17
 1/29 780.40 7/16 803.40
 2/5 692.05 7/23 803.40
 2/12 627.12 8/6 841.06
 2/19 627.12 8/13 803.40
 2/26 627.12 8/20 803.40
 3/05 764.79 9/3 803.40
 3/12 473.84 9/10 803.41
 3/19 703.54 9/17 644.23
 3/26 634.44 9/23 803.40
 4/2 634.44 10/1 803.40
 4/9 780.40 10/8 803.40
 4/16 548.10 10/15 803.40
 4/23 780.40 10/22 642.73
 4/30 803.40 10/29 803.40
 5/7 984.10 11/5 561.37
 5/14 710.46 11/12 803.40
 5/21 631.52 11/26 803.40
 5/28 632.11
 6/4 789.40
 6/11 473.20
 *Page 21 
51. Defendant's employment policies specifically state that plaintiff was not eligible to work overtime if she was incapable of performing her normal pre-injury job duties as a housing technician.
52. Defendants' denial of payment of temporary partial disability to plaintiff, along with the denial of her cervical neck problems and treatment beginning in May of 2006 and defendants' continued denial of her cervical problems up to the time of the hearing before the deputy commissioner was a result of defendants' unreasonable and stubborn unfounded litigiousness.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches
the following:
 CONCLUSIONS OF LAW
1. Plaintiff's neck and cervical problems as treated by Dr. Gilpin, Dr. White, and Dr. Martin are a direct and proximal result of her admittedly compensable injury of November 29, 2004. N.C. Gen. Stat. § 97-2(6)
2. The medical treatment by Dr. Gilpin, Dr. White, and Dr. Martin for plaintiff's cervical problems is reasonably necessary to effect a cure, give relief, or lessen plaintiff's *Page 22 
disability resulting from her admittedly compensable injury of November 29, 2004. N.C. Gen. Stat. § 97-25.
3. Due to plaintiff's injuries and her physical limitations resulting from her November 29, 2004 compensable injury, plaintiff was unable to earn the same or greater wages since her release to full time employment on or about August 1, 2005 and is therefore entitled to payment of temporary partial disability benefits for any and all weeks since such date in which she earned less than her stipulated pre-injury average weekly wage of $1,063.45. N.C. Gen. Stat. § 97-30.
4. Plaintiff's absences which resulted from her neck and cervical problems are a direct and proximate result of her admitted injury and she is entitled to receive temporary total disability benefits for any time which plaintiff missed work due to receiving treatment or at the recommendation of Dr. Gilpin, Dr. White or Dr. Martin. N.C. Gen. Stat. § 97-29.
5. Defendants' denial of plaintiff's neck and cervical treatment after May 2006, was unreasonable, and based on stubborn unfounded litigiousness, as treatment continued to be denied even after being made aware on multiple occasions of Dr. White's opinion that such treatment was causally related. N.C. Gen. Stat. § 97-88.1
6. Defendants' denial of paying plaintiff's TPD benefits was also unreasonable and based on stubborn unfounded litigiousness. N.C. Gen. Stat. § 97-88.1
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD *Page 23 
1. Defendants shall pay for all treatment for plaintiff's neck and cervical problems provided by Dr. Gilpin, Dr. White, and any other providers which are reasonably necessary to effect a cure, give relief or lessen plaintiff's disability as a result of her November 29, 2004 admittedly compensable injury. To the extent plaintiff has paid for any portion of such treatment, defendants shall provide immediate reimbursement to plaintiff for such treatment, medications, and travel expenses.
2. Dr. Dennis White and Dr. Bruce Gilpin are hereby authorized as plaintiff's treating physicians, and this authorization is retroactive to the first time Dr. White and Dr. Gilpin treated plaintiff as a result of her compensable injury by accident.
3. Defendants shall pay plaintiff temporary total disability benefits for each and every day which she received treatment and/or was recommended to be out of work by Dr. Gilpin or Dr. White due to her neck or cervical problems.
4. Defendants shall pay plaintiff temporary partial disability benefits for each and every week for which plaintiff earned less than her average weekly wage of $1,063.45 after her release to return to work on May 2, 2005 and continuing for the remainder of the 300 weeks.
5. Defendants shall pay plaintiff's counsel an attorney fee of 25% of any temporary total disability benefits awarded herein, as well as 25% of any accrued temporary partial disability benefits and future temporary partial disability benefits. Such attorney fee shall not be deducted from the benefits owed to the plaintiff and shall be assessed as a cost of this matter.
6. Defendants shall pay plaintiff for lost time due to her required attendance at the hearing of this matter, which was necessitated by defendants' stubborn, unfounded litigiousness and is assessed as a cost of this matter.
 7. Defendants shall pay the cost of this matter. *Page 24 
This the 3rd day of April 2008.
 S/___________________
 BUCK LATTIMORE
 COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ PAMELA T. YOUNG CHAIR *Page 1